**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHIRLEY GRACE SARAH CALLAHAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 C 5892** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Shirley Callahan ("Callahan" or "Claimant") seeks judicial review under 42 U.S.C. §405(g) of a final decision of Defendant Commissioner of the Social Security Administration ("SSA") denying her claim for Social Security Disability Insurance Benefits ("DIB") benefits under Title II of the Social Security Act ("the Act"). 42 U.S.C. §§416(1); 423. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Claimant asks that the court reverse the decision of the Commissioner (Dkt. 32) and the Commissioner asks that the decision be affirmed.  (Dkt. 42).  For the reasons that follow, Claimant's motion is granted and the Commissioner's motion is denied.  This case is remanded to the SSA for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Procedural History

Claimant applied for DIB on September 11, 2012, alleging that she had been disabled since August 26, 2011, due to back problems.  (R. 137-143, 161.) Her

application was denied initially and on reconsideration (R. 63-84, 101-103), and she filed a request for an administrative hearing. (R. 104.) On February 5, 2014, an administrative law judge ("ALJ") convened a hearing at which Claimant testified and was represented by counsel. (R. 37-60.) In addition, Thomas Grzesik testified as a vocational expert ("VE"). (R. 54-59.) On February 27, 2014, the ALJ denied the Claimant's application for DIB, finding that she was not disabled because she was capable of performing unskilled, sedentary jobs that exist in significant numbers in the national economy. (R. 23-32.) This became the final decision of the Commissioner when the Appeals Council denied the Claimant's request for review on May 5, 2015. (R. 1-3.) *See* 20 C.F.R. §§404.955; 404.981. That decision is now before the District Court for review under 42 U.S.C. §405(g).

### B. Factual Background

Claimant was born on January 8, 1987 (R. 137), making her twenty-seven years old on the date of the ALJ's decision. She has a high-school education. (R. 43.) Claimant has had a number of jobs since 2008, working seasonally as a landscaper in the good weather and doing snow plowing in the winter. (R. 173.) She's also had a couple of jobs as a cook in a restaurant. (R. 173.) She claims she has been unable to work since she injured her back in a car accident in August of 2011. (R. 293.) Claimant is single, and lives with her parents. (R. 42.)

### C. The Medical Record

In August 2011, Claimant was involved in a car accident. (R. 293.) Immediately thereafter, she began having severe pain in her back, neck, and left lower extremity. (R. 293.) At first, Claimant sought relief through chiropractic treatments and massage

therapy. (R. 293). But, the pain continued to get worse and Claimant subsequently got a referral to see Dr. Tyler Koski at the Neurosurgery Clinic at Northwestern Memorial Hospital on January 6, 2012. (R. 293.) Dr. Koski noted that Claimant had not had injections nor had she done a "more formalized physical therapy regimen." (R. 293.) During the examination, Dr. Koski reviewed an old magnetic resonance imaging ("MRI") scan of Claimant's lumbar spine. (R. 294.) Dr. Koski found that Claimant suffered from "a very large disc herniation" with focal compression of her left S1 nerve root, consistent with her radiculopathy. (R. 294.)

On February 8, 2012, Claimant underwent a left-sided minimally invasive L5-S1 laminotomy with microdiscectomy. (R. 273.) Dr. Koski, who performed the procedure at Northwestern Memorial Hospital, reported that the surgery was without complications. (R. 274.) Claimant was discharged that same day. (R. 273.)

On May 3, 2012, Claimant returned to Dr. Koski for a scheduled follow-up appointment. (R. 280.) She reported that she had been doing very well with no residual leg pain until a few days earlier, when she lifted two gallons of water and felt something "shift" and "pop," causing a recurrence of left leg pain. (R. 280.) She stated that, although the pain was not nearly as severe as before, it was similar in distribution and it was worrisome to her. (R. 280.) Dr. Koski noted that Claimant had 5/5 strength in all major motor groups in the bilateral lower extremities. (R. 280.) Dr. Koski thought Claimant was fine to begin physical therapy and he prescribed a Medrol Dosepack. (R. 280.) The doctor felt that Claimant's symptoms pointed to potential recurrent disc herniation. (R. 280.) An MRI done on May 17, 2012, confirmed Dr. Koski's fears: it showed a "persistent left foraminal disc protrusion at L5-S1" and "suspected unilateral

3

right L5 pars defect." (R. 284.)

Dr. Koski referred Claimant to Dr. Geeta Nagpal for pain management on July 25, 2012. (R. 297.) At this examination, Claimant described her pain as 4/10. (R. 298.) Dr. Nagpal suspected that Claimant may have re-injured herself following her microdiscectomy. (R. 297.) Dr. Nagpal's notes indicate that Claimant's goals were "to be more active" and return to work as a landscaper / heavy equipment operator. (R. 298.) During the examination, Dr. Nagpal administered a left L5-S1 epidural steroid injection. (R. 298.) Immediately following the injection, Claimant reported 50% pain relief. (R. 303.)

Claimant continued her follow-up visits with Dr. Koski at the at Neurosurgery Clinic at Northwestern Memorial Hospital. In a letter dated August 16, 2012, Dr. Koski described Claimant's condition, stating she was still "attempting conservative measures to help with her pain." (R. 232.) Dr. Koski opined that Claimant had been unable to work since her surgery. (R. 232.)

Claimant was back to see Dr. Nagpal the next day. Claimant reported that after the first steroid injection, she had excellent relief for her pain, but this only lasted for a few days before the pain returned to the same level or worse. (R. 305.) Claimant was given another left L5-S1 epidural steroid injection, which immediately resulted in a 70% reduction of pain. (R. 306-307.) By September 4, 2012, however, Claimant's pain was back at its previous level and a third injection was ruled out. (R. 310-312.) Conservative treatment with Vicodin, Ibuprofen, and Flexeril had failed as well. (R. 312.) Dr. Nagpal noted that, if Claimant was not benefitting from the steroid injections, another surgery might be necessary. (R. 309.)

On October 2, 2012, Claimant returned to Dr. Koski, reporting persistent pain with no lasting relief from the epidural steroid injections.  (R. 282, 315.)  In his notes, Dr. Koski stated that she "overall is fairly disabled by these symptoms" and he recommended a transforaminal lumbar interbody fusion.  (R. 282, 315.)  Claimant was also developing neck and shoulder pain.  An MRI of her cervical spine, performed October 26, 2012, showed "multilevel degenerative changes … most severe at C5-C6 where there is a central disk protrusion causing mild ventral impression on the cord consistent with mild central canal stenosis."  (R. 336.)  There was also "mild left neuroforaminal stenosis at this level."  (R. 336.)

And, so, it was another surgery for Claimant.  On November 8, 2012, she underwent an L5-S1 transforaminal lumbar interbody fusion with an iliac bone harvest.  (R. 347-48, 364, 370.)  On November 11, 2012, Claimant was discharged in stable condition.  (R. 372, 374.)  She was instructed not to engage in any strenuous activity: she wasn't to lift more than five or ten pounds, not drive until cleared by her doctor, bend or twist at the waist, or sit for more than twenty or thirty minutes without getting up.  (R. 372-373, 405.)

After her surgery, Claimant continued to go to Northwestern Memorial Hospital Clinic for regular follow-ups.  On November 28, 2012, Claimant reported that her left leg pain had resolved, but that she had new right radicular pain, which was "mild and intermittent."  (R. 462.)

On December 5, 2012, Dr. C. A. Gotway reviewed Claimant's medical file on behalf of the state disability agency, and he arrived at a residual functional capacity ("RFC") finding.  He felt that, from the date of her car accident until her lumbar fusion (R.

67), Claimant could occasionally lift and carry up to twenty pounds, and could frequently lift up to ten pounds; could stand and/or walk for six hours in an eight-hour day; could sit for six hours in an eight-hour day; and had no limitations in pushing or pulling. (R. 67-68.) Claimant could only occasionally bend at the waist or bend at the knee, but she was not limited in her ability to crawl, or climb ramps, stairs, ladders, ropes, or scaffolds. (R. 68.) Dr. Gotway also offered an RFC finding for the period "12 Months After Alleged Onset Date: 08/26/2012." (R. 69.) He noted that Claimant underwent lumbar fusion surgery on November 8, 2012, and explained that "[g]iven a normal recovery, the claimant should be able to perform light work activity by 11/08/13, 12 months after her surgery." (R. 69.) Dr. Gotway based his assessment on the medical evidence and Claimant's statements of how her condition affected her ability to work. (R. 72.)

On December 18, 2012, six weeks post-surgery, Claimant reported hypersensitivity in her right foot and right lateral calf. (R. 473.) She denied any new numbness, weakness, or bladder complaints, but she "was concerned about her pain control." (R. 473.) She was experiencing headaches and vomiting from the Norco; as a result, she had been taking Tylenol instead, although it wasn't nearly as effective. (R. 473.) Claimant was prescribed Neurontin 300 mg at bedtime for seven days, and Tramadol was substituted for Norco, in the "the hope of less side effects." (R. 473.) Claimant was also referred for physical therapy and massage therapy. (R. 472-474.)

Three months post-surgery, on January 30, 2013, Claimant reported that her left posterior left leg pain had completely resolved. (R. 481.) She also reported that her right radicular pain had resolved as well. (R. 481.) Claimant denied any new numbness, weakness, or bladder complaints. (R. 481.) She still had some back pain

with certain activities. (R. 481.) She was off all pain medications and wanted to start physical therapy. (R. 481.)

Dr. Francis Vincent conducted another agency review of the record on March 28, 2013. For the period from August 26, 2011 through November 7, 2012, Dr. Vincent essentially agreed with Dr. Gotway that Claimant could perform light work. (R. 79-80.) Similarly, for the period from Claimant's lumbar fusion surgery through November 8, 2013, Dr. Vincent echoed Dr. Gotway's review: "[g]iven a normal recovery . . . [she] should be able to perform light work activity by 11/08/13, 12 months after surgery." (R. 81.)

Claimant next saw Dr. Koski on May 7, 2013. (R. 490, 491.) The doctor noted that Claimant was doing "quite well" and that x-rays six months post-surgery showed "good placement of her instrumentation, and she is starting to have bony fusion at L5-S1." (R. 493.) Dr. Koski thought Claimant was doing reasonably well clinically and released her from all restrictions, with the proviso that "she would be careful and use good spinal precautions when doing activities." (R. 491.)

Shortly thereafter, on May 31, Claimant began treatment with a chiropractor, Dr. Juli Weber Micetich, with sessions continuing through December 2013. (R. 513-520.) Claimant reported pain in her neck, left shoulder blade, midback, left buttock, lower back, and left hamstring. (R. 513.) Dr. Micetich diagnosed Claimant with "subluxation/nonallopathic lesion (segmental dysfunction,) cervical region; degeneration of cervical intervertebral disc; subluxation/nonallopathic lesion (segmental dysfunction), thoracic region; myalgia and myositis, unspecified thoracic." (R. 513.) At each visit, Dr. Micetich made adjustments and noted how Claimant "responded favorably to her

treatment, but she is progressing slower than expected. Her condition has been exacerbated by second surgery." (R. 513-520.)

On July 16, 2013, Claimant returned to the Neurosurgical Clinic, complaining of cervical tightness and discomfort that radiated into her left shoulder. (R. 501.) She was taking ibuprofen for the pain. (R. 500.) Naprosyn was prescribed for inflammation, as well as physical therapy, including some traction; Claimant was given a home traction unit. (R. 501.) A cervical spine X-ray was deemed normal, with no evidence of fracture, defect, or bone destruction. (R. 507.)

On November 12, 2013, Claimant saw Dr. Koski again. Dr. Koski reported that x-rays of Claimant's lumbar spine demonstrated "excellent fusion at L5-S1, normal orientation, and good positioning of the hardware." (R. 547.) Dr. Koski further noted that Claimant appeared "well healed on her x-rays and symptomatically, she was doing quite well." (R. 545.) In his notes, Dr. Koski indicated that Claimant "had some exacerbation of some back and leg symptoms after a cleaning job she completed last week," but he suspected that she needed to "slowly build back into normal activities." (R. 545, 547.) Dr. Koski acknowledged Claimant's neck pain, but he stated that Claimant "does not have anything structurally concerning." (R. 545.) He opined that Claimant should maximize a nonsurgical regimen to treat her pain, and he referred Claimant to a physiatrist, since physical therapy had not been sufficiently beneficial. (R. 545.)

### D. The Administrative Hearing

### 1. Claimant's Testimony

At her administrative hearing on February 5, 2014, Claimant testified that the last

time she had worked was a few weeks earlier.  (R. 41.)  She did some cleaning work for a friend who owned a business cleaning computer rooms.  (R. 41, 42.)  She worked a couple of times a month over the course of two months.  (R. 41.)  This was mostly in the Chicago area (R. 47), but on one occasion, she had to travel to the Detroit area by car – her friend drove.  (R. 42.)  She didn't have to lift anything in the job because her friend knew her limitations.  (R. 46.)  Mostly, she would just do the dusting.  (R. 47.)

Claimant said that she tried to help out her parents around the house somewhat, maybe doing the dishes, dusting, or vacuuming if she was having a good day.  (R. 43, 49.)  She could do some housework for about an hour and a half before she had to lie down for the rest of the day.  (R. 47-48.)  She didn't go shopping.  (R. 45.)  Claimant explained that she might ride along with her mother if she was going shopping, but she couldn't walk around the stores.  (R. 49.)  She got out to see friends about once a month.  (R. 48.)  She didn't sleep well; she woke up at least two times each night due to pain.  (R. 49.)  She would lie down in the afternoon and in the evening after dinner with an ice pack.  (R. 49.)

Claimant testified that she had gotten her GED the previous fall.  (R. 46.)  She couldn't sit through a whole class session, which was ninety minutes to two hours long, without taking about three breaks to get up and walk around a bit.  (R. 48.)  If she had to sit to do a job, even if she could move around, Claimant thought she could last about two hours before she was in too much pain.  (R. 51.)  She said she used to hike, camp, and snowboard, but she couldn't do any of those things any more.  (R. 52.)

## 2. VE's Testimony

After Claimant's testimony, the VE testified.  She characterized Claimant's past

landscaping work as heavy labor.  (R. 56.)  The ALJ then asked the VE whether an individual with the Claimant's educational level and work background, who could perform light work, but who could only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; and who was further limited to work that could be learned in 30 days and was of a simple, routine, repetitive nature could perform any jobs found in the regional economy.  (R. 56.)  The VE said they could, and cited as examples: office helper, routing clerk, and checker.  (R. 57.)  In response to the ALJ further limiting the hypothetical individual to sedentary work, the VE testified that such an individual could perform jobs like call-out operator, information clerk, or order clerk.  (R. 57.)

The VE went on to testify that these types of jobs would allow for a ten- to fifteen-minute break after two hours, a half-hour lunch break after another two hours, and a final ten- to fifteen-minute after another two hours, followed by a final two hours of work.  (R. 58.)  In addition, an individual working one of these jobs could not be off task 25 percent of the time.  (R. 58.)  When questioned by Claimant's attorney, the VE testified that, if a person could only sit for a maximum of fours hours in a workday, there would be no sedentary work they could perform.  (R. 59.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Stepp*, 795 F.3d at 718. We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). "We 'conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.'" *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014)(quoting *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005)).

In that discussion of the issues, while the ALJ is "not required to mention every piece of evidence," she must provide "an accurate and logical bridge" from the evidence to her conclusion. *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016). Along the way, the ALJ cannot ignore evidence favorable to the claimant, but must explain why it was rejected. *Id.* In short, the ALJ's discussion of the evidence and the issues must be sufficiently detailed to allow the Court to trace the path of her reasoning. *Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005).

## B. Analysis Under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ employs a five-step inquiry, asking: (1) whether the claimant is currently employed;

11

(2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The claimant has the burden of establishing a disability at steps one through four. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). If the claimant succeeds, the burden shifts to the Commissioner to show that the claimant is capable of performing other work in the national economy. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

## C. The ALJ's Decision

In this case, the ALJ determined at step one that Claimant had not engaged in substantial gainful activity since August 26, 2011, the date she alleged she became disabled. (R. 25.) At step two, the ALJ found that Claimant suffers from the severe impairments of status post motor vehicle accident, degenerative disc disease, status post fusion surgery, and obesity. (R. 26.) The ALJ then determined, at step three, that Claimant did not have an impairment or combination of impairments that met or equaled the severity of one of the conclusively disabling impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 25.) Next, the ALJ determined that, despite Claimant's impairments, she still had the residual functional capacity ("RFC") to perform sedentary work as long as that work was unskilled due to her concentration issues. (R. 26.)

The ALJ did not believe the Claimant's statements regarding the intensity, persistence, and limiting effects of the her impairments. (R. 27). At step four, the ALJ determined that, given the Claimant's RFC, she could no longer perform her past

relevant work as a landscaper. (R. 30.) Finally, at step five, based on the Claimant's RFC and her age, education, and work experience, and relying on the VE's testimony, the ALJ determined that Claimant could still perform work that existed in significant numbers in the regional and national economy. (R. 31.)

### III. DISCUSSION

Claimant raises a number of issues with the ALJ's decision. Her concerns fall under two topics. First, she contends that, for various reasons, the ALJ's assessment of her allegations was insufficient. Second, she argues that the ALJ's determination of her RFC was flawed – again, for multiple reasons.

### A. The Claimant's Assertions as to her Pain and Limitations

We first acknowledge that the Social Security Administration recently updated its guidance about evaluating claimant's symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, – F.3d –, –, 2016 WL 3997246, at *1 (7th Cir. 2016). Nothing else has changed, however; an ALJ must still provide good reasons for rejecting a claimant's assertions as

to their pain and limitations.  SSR 16-3p, 2016 WL 1119029, at *7.[1]

In this case, the ALJ provided three reasons for her determination that the Claimant's assertions regarding the severity of her impairments were "less than credible."  She began with the medical record, saying it did not support the Claimant's allegations that she suffered debilitating back pain despite her lumbar fusion in November 2012."  (R. 30.)  The ALJ went on to state that the Claimant's work record did not support her allegations either, noting that she worked as a cleaner and traveled in the course of that work.  (R. 30.)  Finally, the ALJ pointed to the Claimant's daily activities as undermining her allegations.  The ALJ felt that the fact that the Claimant was able to do household chores, shop, and drive a car meant that she was no more limited than the ALJ determined in her RFC finding.  (R. 30.)

An ALJ must tread carefully when measuring a claimant's allegations against the medical evidence.  The Seventh Circuit has repeatedly warned ALJs about focusing on the objective medical evidence when discounting allegations of pain.  *See Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *Pierce v. Colvin,* 739 F.3d 1046, 1049–50 (7th Cir. 2014); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004).  The Commissioner's own instructions to ALJs state that they should "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of

---

[1] Though SSR 16-3p post-dates the ALJ's decision in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law.  *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).  As the ALJ did not get into Claimant's character in this case, the Court's analysis would not change one way or the other.

impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, *4. To the ALJ's credit, as already noted, she did not rest her assessment on the objective medical evidence alone. But, as will be discussed, the other grounds for discounting the Claimant's allegations were shaky at best, which would leave only the objective evidence as potential support. Additionally, the objective evidence would seem to lend credence to the Claimant's assertions rather than belie them.

First, there is the Claimant's stint doing cleaning work for her friend's business. The ALJ found it significant that Claimant worked as a cleaner despite her claims that she was unable to work. Indeed, Claimant testified that she wouldn't be able to work a full-time job, eight hours a day (R. 51), but her cleaning job wasn't full time work. In fact, Claimant only did that work a few days a month for a friend, and even at that, only did it for a couple of months. (R. 41.) Her friend didn't make her do any lifting because she knew of her limitations. (R. 47.) During these few days of work over the course of two months, the Claimant stuck to dusting. (R. 47.) That's not much activity at all, and it's sporadic. The ALJ says it undermines Claimant's allegation that she is unable to work, but being able to work means being able to hold down a 40-hour a week, full-time job, not being able to dust a few days a month. *Ghiselli v. Colvin*, – F.3d –, –, No. 14 2380, 2016 WL 4939535, at *5 (7th Cir. Sept. 16, 2016); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

As a general proposition, "[t]here is no inherent inconsistency in being both employed and disabled." *Ghiselli*, – F.3d at –, 2016 WL 4939535, at *5. "One can be employed full time without being capable of substantial gainful activity, paradox though that may seem." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). In this case,

Claimant didn't work full time, or barely even part time; she just worked a day here and there over the winter.  Moreover, she was working for a friend who adjusted her duties according to her limitations.  As the Seventh Circuit has explained, an individual may be able to work simply because their employer is being lax or altruistic.  *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995).  As Claimant was working for an understanding friend, both might have been the case.

Then there are Claimant's daily activities, which the ALJ said did not support any limitations in addition to a restriction to sedentary work.  (R. 30.)  Comparing daily activities to a capacity for work is dangerous territory for an ALJ, as the Seventh Circuit has habitually made clear.  *Ghiselli*, – F.3d at –, 2016 WL 4939535, at *5; *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Bjornson*, 671 F.3d at 647.  "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, . . . and is not held to a minimum standard of performance, as she would be by an employer."  *Bjornson*, 671 F.3d at 647.  In this case, Claimant – who lives with her parents – testified that, around the house, she "tried to help out with the dishes, maybe dusting and vacuuming."  (R. 43.)  After housework, she had to lie down and/or take medicine.  (R. 47.)  She drove once in the two weeks before her hearing, for fifteen minutes.  (R. 43.)  The ALJ ignored the fact that when she did perform these activities, she did so sporadically and with long breaks.  *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)(ALJ must consider the fact that claimant needs breaks or rest to perform daily activities).  The ALJ also ignored the fact that Claimant said she could not sit through a whole movie and that, when she was taking classes, she had to get up and move around two or three times during a two-

hour period. (R. 48.) That testimony certainly supports greater limitations than a capacity to perform sedentary work eight hours a day, five days a week without a sit-stand option. *See Roddy*, 705 F.3d at 639 ("[Claimant's] inability to get through the day without lying down three to four times for an hour, or to complete even simple chores requiring standing, like cooking, does not indicate an ability to work even a sedentary job full-time.").

Without Claimant's cleaning work and daily activities as valid reasons for discounting the extent of her complaints, the ALJ is left with only the medical evidence. And, again, that cannot be the sole basis for rejecting a claimant's assertions regarding the severity of her impairments. *See Cole*, – F.3d at – 2016 WL 3997246, at *4 (". . . an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."); *Pierce*, 739 F.3d at 1050 (ALJ cannot "rest[] his credibility determination too heavily on the absence of objective support for [a claimant's] complaints without digging more deeply."). Even if that were not the case, the ALJ's characterization of the record as failing to support Claimant's allegations is questionable.

Essentially, the ALJ trained her focus on the most recent evidence, which showed that Claimant was improving in the spring of 2013 and that, finally, in November 2013, Dr. Koski did not place any limitations on her activities. (R. 29.) But, there was quite a lot of struggle to get to that point and, during that period, the record certainly does not undermine Claimant's complaints. As even the ALJ acknowledged, the objective medical evidence first demonstrated what Dr. Koski called a "very large disc herniation"

17

as far back as January of 2012, as a result of a car accident in August of 2011. (R. 27, 294.) Straight leg raising was positive for nerve root involvement on the left side. (R. 27, 294.) The Claimant had to undergo spinal surgery – a microdiscectomy and laminotomy – in February 2012. (R. 27, 273-274.) While there was initial improvement, the Claimant still had intermittent radiating pain and numbness, and still needed a narcotic pain reliever every day. (R. 295.) Then, in May, the Claimant reinjured her back while grocery shopping. (R. 280, 296.) She suffered throbbing pain radiating down her left leg. (R. 298.) Straight leg raising was again positive on the left and her range of motion in her lumbar spine was significantly limited. (R. 300.) MRI revealed a persistent disc bulge at L5-S1, which abutted the left L5 nerve root. (R. 284, 301.) The ALJ states that Claimant gained significant relief with a series of epidural steroid the injections at that point (R. 28), but that's not how the cited evidence reads. In fact, Dr. Koski reported that Claimant "ha[d] not obtained substantial benefit" after two injections and that course of treatment was discontinued before a third because the injections weren't helping. (R. 313.)

In August 2012, a year after Claimant's alleged onset date, Dr. Koski reported that the Claimant was still unable to work (R. 232), and in October 2012 that she was "overall fairly disabled" and would need a lumbar fusion. (R. 282, 315.) That was done on November 8, 2012 (R. 347-348, 364, 370), and she was told to avoid lifting more than five or ten pounds and sitting for more than twenty or thirty minutes at a time without getting up for a break. (R. 372-373, 405.)

As such, there was a significant period of time before Claimant improved to the point where her doctor said she was released from all restrictions, or even to where she

arguably could perform sedentary work, especially without the option to change position frequently or at will. Rather than simply disregard that period of time and reject Claimant's allegations in totality, as the Claimant submits, the ALJ ought to have at least considered whether Claimant had been disabled for a closed period. *See Stepp*, 795 F.3d at 719(claimant must prove a disability which has lasted, or can be expected to last, for twelve months). Because of the ALJ's failure to support her rejection of Claimant's allegations with good reasons, this matter must be remanded to the Commissioner.

## B. The ALJ's RFC Determination

The Claimant also raises some concerns regarding the ALJ's RFC determination. The ALJ found that Claimant was able to perform sedentary work as long as it was unskilled work due to problems she might have with concentration as a result of her pain. (R. 26.) The Claimant wonders how the ALJ arrived at that conclusion, and with good reason. The ALJ said that, in limiting Claimant to sedentary work, she was giving her "the full benefit of the doubt in connection with her reports of back pain." (R. 30.) But, the Claimant reported that she needed two or three breaks to stretch in order to sit through a two-hour class and could not sit through more than half a movie on a good day. (R. 48.) Without a sit-stand option – and the ALJ didn't allow for one – sedentary work requires the ability to sit for long periods of time. *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014). A person would only be able to take a break every two hours, according to the VE (R. 58), not multiple times in a two-hour span. So, the ALJ clearly didn't give Claimant the benefit of the doubt and didn't base her RFC finding on Claimant's testimony.

The ALJ didn't base it on the medical record either. Dr. Koski reported that Claimant was unable to work in August 2012, and had been unable to work from at least February 2012 on. (R. 458.) As of October 2012, he said she was "overall fairly disabled." (R. 315.) Following surgery in November 2012, Claimant was instructed not to lift more than five or ten pounds, drive, or sit for more than twenty or thirty minutes without standing up for a break. (R. 372-373, 377-378.) It was not until May of 2013 that Dr. Koski released Claimant from all restrictions. (R. 491.) The ALJ gave Dr. Koski's opinion "no weight", which she was free to do as long as she provided good reasons for doing so. *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). The ALJ gave two reasons here. She noted that Dr. Koski had "only" treated Claimant for eight months, and that his August 2012 opinion was inconsistent with his later reports that he had released her from all restrictions. (R. 29.) Neither is convincing.

Length of treating relationship is one factor to be considered in weighing a physician's opinion, *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014), but here, the only other opinions were from agency doctors who had never even examined Claimant. If length of treating relationship meant something to the ALJ, Dr. Koski's opinions would trump all. Moreover, he treated Claimant beyond the eight months the ALJ mentioned, and continued to opine she was disabled or restricted from most activities in October 2012 and November 2012. (R. 315, 372-373, 377-378.) And, simply put, rejecting an opinion that a claimant is disabled in August 2012 because, a year later, the doctor released her from all restrictions makes no sense. Yet, that's what the ALJ did here.

As just noted, the only other medical opinion in the record comes from the

agency's reviewing physicians. The ALJ vaguely accorded the opinions of the agency

doctors who reviewed the record "some weight" because she thought there was a

"reasonable basis" for their opinions. (R. 30.) The ALJ didn't say what that "reasonable

basis" was, however, and it's not clear from Dr. Gotway's or Dr. Vincent's report.

Actually, it's not even entirely clear what the two doctors' opinions were because they

appear to be internally inconsistent. As the Commissioner explains in her brief, Dr.

Vincent broke his opinion into two time periods, August 26, 2011 to November 7, 2012,

and November 8, 2012 to November 8, 2013. (Commissioner's Memorandum, at 10; R.

79, 80.) The Commissioner says that he determined that the Claimant could do light

work during both periods (Commissioner's Memorandum, at 10), but that's not all the

doctor said.

On the one hand, Dr. Vincent did find Claimant could perform a full range of light

work during both periods (R. 79-80, 80-81), but on the other, he indicated that Claimant

would need a year to recover from her November 2012 surgery and "should be able to

perform light work activity by 11/08/13 . . . ." (R. 81.) That statement would tend to

support a closed period of disability from November 2012 to November 2013. *See* 42

U.S.C. § 423(d)(1)(A)(defining disability as an inability to "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."). That would seem to make more

sense, otherwise, why would the doctor break his consideration of the evidence into two

periods if he were finding the same RFC for both? Moreover, it would be surprising

indeed that an obese woman, who had just had spinal fusion surgery, could do work that

21

required unlimited climbing of ropes. (R. 81.) Dr. Gotway's earlier report was essentially the same as Dr. Vincent's. (R. 67-70.) So, either both reports are internally inconsistent and the ALJ's reason for giving them some weight is unfounded, or the state agency reviewing physicians found Claimant should have a closed period of disability, meaning the ALJ couldn't have accorded their opinions any weight at all because the ALJ found Claimant not disabled. The path of the ALJ's reasoning cannot be followed.

It is also unclear that the ALJ considered the effects of Claimant's obesity on her ability to work. The ALJ found it to be a severe impairment, and said she considered it in formulating Claimant's RFC. (R. 26.) Presumably, that means the ALJ found Claimant's obesity contributed in some way to her restriction to sedentary work, but, that's not obvious. An ALJ has to discuss obesity's effect on a Claimant's capacity for work – even sedentary work. *See Browning*, 766 F.3d at 707("The administrative law judge acknowledged that the plaintiff's obesity was a factor . . . , but did not discuss its bearing on her ability to do sedentary work. . . . [Obesity] might make it difficult for her to sit for long periods of time, as sedentary work normally requires.").

In addition, there is a problem with the ALJ's finding that Claimant was limited to unskilled work due to concentration issues. (R. 26.) In her hypothetical to the VE, the ALJ didn't mention any concentration issues. She said that the hypothetical "individual could perform unskilled work tasks with either by [sic] demonstration or with 30 days or less [sic] that would be of a simple, repetitive, routine nature." (R. 56.) An ALJ's hypothetical to a VE must incorporate all of the claimant's limitations supported by the medical record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Yurt v. Colvin*, 758

F.3d 850, 857 (7th Cir. 2014).  As the ALJ found Claimant to have an issue with concentration, the ALJ had to account for it in her hypothetical.  A restriction to unskilled work – the ALJ's RFC finding – or even simple, repetitive, routine work – the ALJ's hypothetical – does not accomplish that.  The fact that a job is simple and can be learned in 30 days does not necessarily mean it does not require a good deal of concentration.  *Varga*, 794 F.3d at 814.  The same can be said of repetitive, routine work.  Assembly line work is the epitome of repetitive and routine, but it would not allow for waxing and waning focus.  It may well be that a person with concentration issues could perform the jobs the VE gave as examples, but that's not what the ALJ asked the VE.

Finally, the Court notes that Claimant asks that this case not be remanded, but that the Court order an award of benefits.  This is not an appropriate case for such relief.  An order to award benefits is only appropriate if all the factual issues have been resolved and the record supports a finding of disability.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005).  Here, that is not the case.  Indeed, Claimant cannot even specify whether she is entitled to a closed or open period of disability.  (Plaintiff's Brief, at 18).  The problems with the ALJ's decision have to do with the ALJ's failure to build a logical bridge from the evidence to her conclusion.  It may well be that substantial evidence supports a finding that the Claimant is not entitled to benefits, but that is a matter to be determined on remand.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, . . . if, while there is enough evidence in the record to support the decision, the reasons given by the [ALJ] do not build an accurate and logical bridge between the

evidence and the result.").

## IV. CONCLUSION

For the foregoing reasons, Claimant's motion to reverse and remand the ALJ's decision (Dkt. 32) is granted, and the Commissioner's motion to affirm the ALJ's decision (Dkt. 42) is denied. This matter is remanded to the SSA for further proceedings consistent with this order. It is so ordered.

**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**

**DATED: October 19, 2016**